THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 19, 2021

**DEWEY ABBOTT III v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Rutherford County**
**No. F-74606    David Bragg, Judge**

_____

**No. M2020-00500-CCA-R3-PC**
_____

The Petitioner, Dewey Abbott III, appeals from the Rutherford County Circuit Court's denial of his petition for post-conviction relief from his second degree murder conviction and his agreed upon fifteen-year sentence. On appeal, the Petitioner contends that the post-conviction court erred by denying relief on his ineffective assistance of counsel claims. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

John C. Taylor, Murfreesboro, Tennessee, for the appellant, Dewey Abbott III.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

In 2015, the Petitioner was indicted for the first degree murder of Jesse Sliepenbeek, who was shot inside the Petitioner's apartment. The Petitioner did not deny shooting and causing the victim's death. At the trial, he asserted self-defense, and on December 9, 2016, the jury found the Petitioner guilty of second degree murder. The Petitioner received a fifteen-year sentence by an agreement of the parties in exchange for the Petitioner's waving his rights to a sentencing hearing, to file a motion for a new trial, and to appeal his conviction. On November 9, 2017, he filed a petition for post-conviction relief, alleging, in relevant part, that trial counsel provided ineffective assistance by failing to impeach Lisa McLean adequately, failing to present defense witnesses to support his claim of self-defense, failing to object when the State referred to the shooting as "murder," failing to

introduce evidence of the Petitioner's attempted 9-1-1 call before the shooting, and failing to present the Petitioner's wife as a defense witness in order to impeach Jammie Taylor's credibility.

## Trial Proceedings

The trial evidence showed that on July 21, 2015, law enforcement received a report of a shooting at the Petitioner's apartment. Police officers who responded to the scene found the Petitioner waiting outside the apartment. The Petitioner cooperated with officers, did not possess a weapon when he approached the officers, and was taken into custody. The Petitioner smelled of alcohol and consented to a blood draw to determine his blood alcohol concentration, which was 0.043 percent according to a toxicology report. The Petitioner's blood sample was negative for controlled substances. Photographs of the scene showed a pile of clothes in the living room and showed the victim lying on top of a pile of blankets near the kitchen/living room area. The clothes found under the victim included a sleeping bag and blankets. Police officers examined the blankets at the scene for bullet holes, but none were found. The items in the pile were neither collected as evidence nor analyzed for gunshot residue. A loaded nine-millimeter Makarov handgun was found on the kitchen counter, and two cartridge casings were recovered from the apartment. An analysis of the cartridge casings reflected that the rounds were fired from the handgun. A fired bullet was found under the victim on the pile of blankets, and two additional bullets were recovered from the victim. An analysis reflected that the three bullets were fired from the handgun.

An analysis of the shirt worn by the victim at the time of the shooting did not reflect the presence of gunshot residue, and as a result, the distance between the handgun and the victim could not be determined by a ballistics expert. However, a ballistics expert agreed that if an intervening object was in front of the victim's shirt, such as a blanket or clothes, the expert would have expected the blanket or clothes to have gunshot residue if the handgun was fired at close range.

Thomas Deering, M.D., an expert in forensic pathology, performed the autopsy and testified that the male victim, who was 5′11.5″ tall and weighed 256 pounds, suffered three gunshot wounds, which did not reflect any soot or stippling. Dr. Deering stated that a gunshot wound would not have soot if the distance between the handgun and the wound was more than six inches. Dr. Deering stated that a gunshot wound would not show stippling if the distance between the handgun and the wound was more than twenty-four inches. Dr. Deering said that soot and stippling could be prevented from appearing if a bullet traveled through clothes, a pillow, or a wall. Dr. Deering was not provided with any clothes or blankets and concluded that the wounds were inflicted at a distant or indeterminate range. Dr. Deering said, though, that based upon the victim's skin at the wounds, it looked as though the wounds were distant. Two bullets entered the victim's

chest, and one bullet entered the victim's back. Dr. Deering stated that the location of two of the bullet wounds indicated that the victim was moving when the handgun was fired and that one of these two wounds indicated the victim was "tilted towards the shooter." Two bullets traveled slightly downward, and the third bullet traveled slightly upward. The victim had no additional significant injuries. A toxicology analysis of the victim's blood showed a blood alcohol concentration of 0.19 percent, and an analysis of vitreous ethanol showed an alcohol level of 0.23 percent.

On cross-examination, Dr. Deering testified that soot wiped off easily and that blood and resuscitation efforts could remove soot. He said that stippling did not wipe off but could imbed upon clothes or something positioned between the handgun and the victim's skin. Dr. Deering said that the victim's gunshot wounds appeared to be distant, meaning more than two feet from the handgun, but that he could not determine definitively the distance because he was not provided the victim's clothes in order to examine them for soot and stippling. He said that if the handgun were fired two feet from the victim, it was possible for no soot and stippling to occur. He said that if the gunshot wounds to the chest were inflicted first, the victim would have "to twist up and turn away."

Murfreesboro Police Sergeant Mike Luzadder testified that he found the victim lying on the pile of clothes and blankets inside the Petitioner's apartment. The victim told the sergeant, "I come to get my stuff, and he shot me."

Tamara Caballero, the victim's aunt, testified that the victim and the Petitioner had a "love, hate relationship." She said that the victim lived with her, although he was married and that a few days before the shooting, the victim asked if he could take various household items, including blankets and sleeping bags, to the Petitioner's apartment.

Ayuni Sliepenbeek, the victim's son, testified that he had worked with the victim and the Petitioner at an expediting company. Mr. Sliepenbeek recalled that the victim and the Petitioner were friends but said that their relationship was "up and down." Mr. Sliepenbeek said that on the night of the shooting between 10:00 p.m. and midnight, he saw the victim at Ms. Caballero's home and that the victim was not upset or angry. Mr. Sliepenbeek said that the victim ate dinner and prepared to go to bed. Mr. Sliepenbeek said that he left and that when he returned around 1:00 or 1:30 a.m., the victim was gone. Mr. Sliepenbeek said that he called the victim, who calmly stated that he was going to pick up his belongings at the Petitioner's apartment and would return shortly.

On cross-examination, Mr. Sliepenbeek testified that the victim had taken some belongings to the Petitioner's apartment because the victim had stayed a couple of nights with Lisa McLean at the apartment. Mr. Sliepenbeek could not explain why the victim went to the Petitioner's apartment at 1:00 a.m. to retrieve his belongings. Mr. Sliepenbeek

said that although he did not witness the victim drink on the night of the shooting, the victim was intoxicated.

Jammie Taylor testified that she and the victim had been neighbors and that the victim introduced her to the Petitioner in 2010. She said that in 2014, she and the Petitioner discussed an argument the Petitioner had with the victim. She said that the argument occurred a couple of days before their conversation, that the Petitioner did not discuss the details of the argument, and that the Petitioner said, "[O]ne of these days he's going to come at me, he's going to say the wrong f------ thing or he's going to do the wrong f------ thing, and I'm going to shoot that motherf-----." She said that she and the Petitioner were inside her home at the time of the conversation. She thought the Petitioner was serious because the Petitioner and the victim had not spoken for several days. She said that the Petitioner patted his handgun during the conversation and that she thought the handgun was at the Petitioner's left side because he stood at the back door.

On cross-examination, Ms. Taylor testified that she had never witnessed the Petitioner and the victim argue or fight. Although she stated that she and the Petitioner "chatted" many times, she denied that they were close friends. She said that she saw the Petitioner frequently because her husband and the victim socialized with the Petitioner. She said that during her and the Petitioner's chats, she might have told the Petitioner that she was angry with the victim and her husband for their attitude toward her when the men were intoxicated. She said she might have told the Petitioner about her brother's and the victim's fighting. She explained that her brother was bipolar and that the victim defended himself against her brother. She said her "reluctance" to discuss the details at the trial was because the incidents involved sensitive and embarrassing information. She said that although she and the Petitioner discussed many topics during their chats, she did not recall any specific conversation, including a conversation about the victim.

Ms. Taylor testified that the Petitioner considered her a friend. When asked when the Petitioner came to her home to discuss the victim, Ms. Taylor said 2013. She said that the conversation occurred "right before" the Petitioner and the victim moved out of the neighborhood. She did not recall the time of day she and the Petitioner spoke. She recalled that the Petitioner put his left hand on his handgun. She did not know the Petitioner was right-hand dominant. She agreed that the Petitioner's statement was not a threat to the victim but, rather, was a response to the next time the victim "came at" the Petitioner.

Lisa McLean testified that at the time of the shooting and of the trial, she and her husband were separated. She said that in November 2014, she met the victim online and that they began dating. She said they were friends at the time of the shooting. She said she never saw the victim with a weapon during their relationship. She said that on July 20, 2015, she was preparing to go to jail for a domestic assault conviction, which she said was the extent of her criminal history. She said that she asked the victim to help her find a

-4-

place to stay until her "court date" and to be her power of attorney while she served her sentence. She said that the victim agreed and that the victim arranged for her to stay at the Petitioner's apartment. She said that although she had never met the Petitioner, she knew he and the victim were friends and former coworkers. She was unaware of any "issues" between them.

Ms. McLean testified that on the evening of July 19, 2015, she, the Petitioner, the victim, the Petitioner's daughter, and the Petitioner's grandchildren were at the Petitioner's apartment. Ms. McLean recalled that she cooked dinner, that everyone ate and drank alcohol, and that they talked. She said that the victim did not have a weapon and that everyone was still at the apartment when she went to bed. She said that when she awoke the next morning, the Petitioner, his daughter, and his grandchildren were at the apartment and that the victim was gone. She said that the victim returned to the apartment at 2:00 or 3:00 p.m., that she later cooked dinner for herself, the Petitioner, and the victim, and that they ate, drank alcohol, and talked. She said the victim did not have a weapon. She said that she took the victim's wallet and placed information inside it relative to things she needed him to do while she served her sentence. She said that afterward, she placed the wallet under a couch cushion and that the victim knew where she placed it. She said that later in the evening, she took the victim's car keys and placed them in her bedroom because the victim was intoxicated.

Ms. McLean testified that before midnight, she and the victim argued. She said that although she had three beers, she did not know how much the victim drank but that it was enough she did not want him to drive. She said the Petitioner drank, but she did not know how much. She did not recall what started the argument between her and the victim but said that she was struck in the face. She recalled asking the victim why he struck her and said that she was shoved down. She said she stood and wanted the victim to calm himself because he was too intoxicated to drive. She said that the victim shoved her down again, that she stood, and that she asked him why he was being "hostile." She said the victim left. She said the Petitioner did and said nothing during the incident. She recalled that the Petitioner was in the living room and that she and the victim were in the hallway.

Ms. McLean testified that although she was unsure, she thought the victim returned to the Petitioner's apartment about one or one and one-half hours later. She said that while the victim was gone, she and the Petitioner discussed the incident. She said that they discussed her lack of understanding about why the victim was angry, her father and the Petitioner's working together previously, and other "random things." She recalled that she and the Petitioner were upset with the victim for his conduct. She said that she and the victim communicated through Facebook Messenger when the victim was gone from the apartment, that the victim said he did not have his wallet, and that the remaining messages were "angry banter." She said she told the victim that she did not have his wallet. She said she looked for it but could not find it. She did not recall if she told the Petitioner about the

-5-

messages she and the victim had exchanged but recalled she told the Petitioner that the victim was returning to the apartment to pick up his belongings. She said the Petitioner stated that if the victim became violent, the Petitioner would "handle the situation." She said that she gathered the victim's belongings, placed them in a basket, and placed the basket by the front door.

Ms. McLean testified that the Petitioner told her to unlock the door when the victim returned. She said that when the victim arrived, he pulled the basket of his belongings outside the apartment and walked inside. She did not see the victim with a weapon. She said that she stood to the right of the front door and that the Petitioner stood at the kitchen sink as the victim walked down the hallway. She said that she asked the victim what he was doing because she did not think the victim would come inside the apartment and that the victim said he was getting the remainder of his belongings. She said that the victim grabbed the blankets from the bedroom floor and that he held a "pretty big handful" of things with both hands. She said that the victim asked for his wallet in an angry tone, that she returned to the couch to look for it, that she did not know what the victim was doing as she looked through the couch, and that she heard the victim say, "[S]o you're going to shoot me." She said that although the victim spoke, she did not hear the victim threaten to harm anyone. She said that as she turned around from the couch, she heard a gunshot followed by a pause and then two rapid gunshots. She said that the Petitioner stood near the kitchen sink and that the victim was about six to eight feet from the Petitioner. She said that after the shooting, the Petitioner left the apartment.

Ms. McLean testified that the victim fell face down on the blankets and that his feet were toward the dining room area. She said that when she checked on him, he did not respond, that she told him there was nothing she could do for him, that she washed the blood off her hands in the sink, and that she left the apartment. When asked if she had previously stated the Petitioner had defended her, she said that she had stated the Petitioner "would protect me" but that she did not believe the Petitioner shot the victim to protect her. She said that at the time of the shooting, the victim was not harming her or the Petitioner.

On cross-examination, Ms. McLean testified that everyone had a good time on the night of the shooting. She said that generally, she and the victim argued when the victim became intoxicated and that they argued on the night of the shooting. She said that although she did not know when the argument began, she recalled that they began socializing around 2:00 or 3:00 p.m. and that the argument began after sunset.

Ms. McLean testified that the victim gave her his wallet in order for her to place information inside the wallet for safekeeping. She said that she attempted to return the wallet but that the victim "refused to take it." She said she placed it under the couch cushion because it was a safe location and because she knew the wallet's location. She denied hiding it from the victim. When shown a transcript of her preliminary hearing

testimony, she agreed she testified previously that she hid the victim's wallet. She said that she wanted to keep the victim's wallet because she did not want the victim to leave due to his intoxication. She likewise agreed that she first testified about taking the victim's keys at the trial and that she had not mentioned it previously.

Ms. McLean testified that during the altercation on the night of the shooting, the victim punched her in the face, that she fell on her "back side," and that the victim "pushed" her down the hallway. She agreed her nose was bloody and said the Petitioner told her that her nose was bleeding. She denied that the Petitioner helped clean the blood. She agreed, though, she testified at the preliminary hearing that the Petitioner helped clean the blood. She said that after the victim left the apartment, the Petitioner told her that he would "handle the situation" if the victim "became violent on his return." She said that she never saw the victim carry a weapon during the time she knew him.

Ms. McLean testified that she never saw the Petitioner with a handgun during the time she stayed at his apartment. She agreed that the Petitioner neither threatened her nor the victim with a gun on the night of the shooting. She said that after the victim left the apartment, the Petitioner did not show her a handgun and did not threaten to harm or to shoot the victim. She said the Petitioner implied that he would protect her from the victim if she needed protection. She agreed that she was not looking at the men just before the shooting began, that she turned toward the men as she heard the gunshots, and that she did not know what occurred before the shooting. She did not know where the victim stood at the time he was shot and whether the victim came toward the Petitioner. She said that when the victim was shot, he stood with his feet toward the dining room area and that he fell face forward on the blankets. She said that when she turned around, the victim stood with two gunshot wounds to the chest, that he took two steps backward, as though he was stumbling, that he turned to his right and slumped down to his knees, and that he fell on his chest on top of the blankets. She said that the victim's two steps took the victim away from the kitchen.

Ms. McLean testified that she never gave the victim his wallet because he refused to take it, although she admitted she testified at the preliminary hearing that she returned his wallet before he left the apartment. She did not know what happened to the wallet because it was not found under the couch cushion. She said the victim had his keys because he drove away from the Petitioner's apartment.

Ms. McLean reviewed the preliminary hearing diagram reflecting where she said the victim stood at the time of the shooting. She agreed that she marked the victim as standing closer to the kitchen on the preliminary hearing diagram than on the trial diagram. She agreed that she had pending criminal charges at the time of the preliminary hearing and that she spoke to the District Attorney General about her charges before her preliminary hearing testimony. She denied that she received any beneficial treatment in

exchange for her preliminary hearing testimony. She said, though, that the defense called her as a witness at the preliminary hearing. After reviewing her preliminary hearing testimony, she agreed that she spoke to the State before she testified at the preliminary hearing. She denied telling counsel that she had spoken to the State and that she hoped to receive "a good deal." She said that although she did not receive any "deals" from the State, her probation violation was "dismissed" after she served two weeks in jail.

The recording of the 9-1-1 call placed at 1:28 a.m. by the Petitioner was played for the jury. The Petitioner's police interview was, likewise, played for the jury. The recordings of the call and the interview are not included in the appellate record. However, other evidence showed that the Petitioner stated during the 9-1-1 call that the victim had blankets draped over the victim's arm, that the victim had assaulted Ms. McLean earlier in the night, that the Petitioner told Ms. McLean not to open the apartment door, and that the victim came at the Petitioner as the Petitioner stood in the kitchen.

Murfreesboro Police Detective James Abbott attended the autopsy and testified that the wounds were not consistent with "someone shooting someone straight on as if two people were facing each other." He participated in the Petitioner's police interview, and he agreed that the Petitioner spoke to the police without asking for an attorney, to speak to anyone, and to make a telephone call. Detective Abbott stated that the crime scene had been released by the time of the Petitioner's interview, which occurred at 6:08 a.m., less than five hours after the shooting.

Detective Abbott testified that during the police interview, the Petitioner was cooperative, spoke directly, made eye contact, and answered all of the questions asked of him. Detective Abbott stated he discredited the Petitioner's statement that the victim was "right here in his face coming at him," although the detective had not been present during the shooting, had not been to the crime scene, and had not seen photographs of the scene at the time of the interview. Detective Abbott said, though, that the location of the gunshot wounds and Ms. McLean's police statement did not support the Petitioner's version of events.

Detective Abbott testified that before the Petitioner's police interview began, the Petitioner placed a telephone call, during which he told the person with whom he spoke that the victim "came into his home," that the victim entered a bedroom and came out holding blankets, that the Petitioner could not see the victim's arms, and that the victim came toward the Petitioner in the kitchen. Detective Abbott agreed that during the call, the Petitioner expressed fear when the victim came toward the Petitioner, that the Petitioner admitted shooting the victim more than once, and that the Petitioner stated the victim had a blanket covering the victim's arm. Detective Abbott agreed that the Petitioner said during the call that the victim had punched Ms. McLean in the face and that he told her not to open the apartment door.

Detective Abbott's testimony showed that the Petitioner's police statement was consistent with Ms. McLean's testimony regarding the events before the shooting. Detective Abbott agreed that the Petitioner admitted drinking alcohol and discussed with the detective the physical altercation between Ms. McLean and the victim before the shooting. Detective Abbott likewise agreed that the Petitioner stated the victim caused Ms. McLean to bleed. Detective Abbott stated that the Petitioner reported calling the victim when the Petitioner learned the victim was going to return to the apartment and that the Petitioner showed the detective his cell phone, which reflected a thirty-second call to the victim's cell phone. Detective Abbott stated that the Petitioner told Ms. McLean twice not to open the door when the victim returned to the apartment but that she opened the door against his wishes. Detective Abbott agreed that the Petitioner said the victim pushed Ms. McLean to the side as the victim entered the apartment, walked into the bedroom, and left the bedroom with "something draped across his shoulder . . . and hands." Detective Abbott agreed the Petitioner said at least four times that the victim came toward the Petitioner, who was in the kitchen, rather than leave the apartment and that the victim lunged at the Petitioner. Detective Abbott agreed that the kitchen did not have a door from which the Petitioner could have left the apartment and that the Petitioner said he took two steps backward in the kitchen.

Detective Abbott testified that although the Petitioner said the victim carried blankets, bedding, or a sleeping bag, the items were not collected from the apartment. Detective Abbott said, though, he assumed the items had been collected because the items could have contained evidence, depending on the distance between the victim and the Petitioner at the time of the shooting. The detective agreed that the items should have been examined for gunshot residue. Detective Abbott stated that the Petitioner said the tissue paper Ms. McLean used to clean the blood from her face was inside the bathroom but that the police did not collect it.

Detective Abbott testified that the Petitioner asked the detective to examine Ms. McLean's cell phone in order to review the messages she exchanged with the victim on the night of the shooting. Detective Abbott agreed that Ms. McLean's phone was not examined but said she discussed the messages during her police interview. Detective Abbott said that the Petitioner reported misdialing in an attempt to call 9-1-1 and that the Petitioner's phone showed the attempted call.

Detective Abbott testified that the handgun was found on the kitchen counter, which was where the Petitioner said he placed it. Detective Abbott said that blankets were found on the floor as the Petitioner stated, although the detective disputed whether the blankets lay toward the end of the kitchen counter or toward the living room. Detective Abbott agreed that the Petitioner reported being afraid of the victim, who said repeatedly, "I ain't scared." Detective Abbott said that he was advised by other officers that the victim's feet were toward the kitchen. Detective Abbott agreed that the Petitioner always stated that the

victim was coming at the Petitioner and never said the victim was going toward the apartment door. Detective Abbott agreed that the Petitioner consistently stated he told Ms. McLean not to open the apartment door when the victim arrived.

Detective Abbott identified a photograph of the Petitioner's cell phone and testified that it reflected a call to the victim at 1:23 a.m. Detective Abbott said the Petitioner stated that as the Petitioner called the victim, the victim knocked on the apartment door. Detective Abbott agreed that the Petitioner said he attempted to call 9-1-1 after the victim returned and entered the apartment. Detective Abbott identified a second photograph of the Petitioner's phone, which the detective said showed that the attempted call was placed at 1:26 a.m. Detective Abbott said that the phone's log reflected a call to 9-4-1.

On cross-examination, Detective Abbott testified that the Petitioner said the victim fell on the items the victim carried out of the bedroom. Detective Abbott identified a photograph of the scene, which he said depicted the pile of several blankets located at the entrance of the living room. On redirect examination, Detective Abbott testified that the Petitioner only mentioned that the Petitioner and the victim had been former neighbors and coworkers.

The Petitioner testified that he and his wife had been separated for about two years and that they were separated at the time of the shooting. He said that he had lived at the apartment where the shooting occurred since February 2015. He said that he and the victim had previously been coworkers and neighbors and that they had many "good times" together during the seven years they knew each other. The Petitioner said that the victim asked if Ms. McLean could stay at the Petitioner's apartment until Ms. McLean's court date and that the Petitioner agreed. The Petitioner allowed the victim and Ms. McLean to place her belongings inside a bedroom while the Petitioner was gone from the apartment. On the day of the shooting, the victim came to the apartment with groceries, and Ms. McLean cooked for the three of them. The Petitioner stated they ate dinner and talked about "old times."

The Petitioner testified that as he leaned backward on the couch watching television, Ms. McLean flew "through the air" and fell on the floor. He said that she screamed and that he followed her to the bathroom. He recalled that he attempted to calm her because he did not want to be evicted for creating loud noise. He said that he learned the victim had struck Ms. McLean and that he initially thought the victim had left the apartment. The Petitioner said, though, the doors were locked. The Petitioner said that when Ms. McLean was in the bathroom, he found the victim hiding inside a closet, that he told the victim to leave, and that the victim left. The Petitioner recalled that Ms. McLean's nose was "busted" and bloody and that she used tissue paper to stop the bleeding.

-10-

The Petitioner testified that he had been drinking alcohol and that when he entered the kitchen, Ms. McLean said, "[O]h look, he's lost his wallet." He said that he looked toward the living room and that he saw Ms. McLean removing the couch cushions and looking under the couch for the victim's wallet. The Petitioner said that, initially, he did not think the victim would return but that he knew the victim would return when Ms. McLean said, "[O]h, look, he thinks we're having sex."

The Petitioner testified that after the victim left the apartment, he went to the kitchen and that Ms. McLean and the victim exchanged messages. The Petitioner said that the victim knocked on the apartment door as the Petitioner called the victim. The Petitioner said he heard the victim on the phone and an echo. The Petitioner said that he called the victim to tell him not to return to the apartment. The Petitioner said that he would have called the police after the victim struck Ms. McLean but that the Petitioner was concerned she would have told the police the Petitioner struck her. He said he did not know Ms. McLean well. The Petitioner said that he told Ms. McLean not to open the door but that she opened it. He said the victim "ranted" about something and walked to the bedroom. The Petitioner said that when the victim left the bedroom, the victim "put [stuff] on his shoulders" and came "right toward" the Petitioner, "trying to get" the Petitioner. The Petitioner said that he feared the victim because the Petitioner could not see the victim's hands, because the Petitioner did not know if the victim had a weapon, and because the Petitioner thought the victim might have attempted to grab the Petitioner and the handgun. The Petitioner said that the victim draped things over his arms and "started towards" the Petitioner and that the victim said, "I ain't scared." When asked why he thought the victim was going to hurt him, the Petitioner said, "I just had a feeling that I was going to get hurt." The Petitioner thought he would be hurt "bad" based upon what the victim had "said to another guy that messed with his first wife." The Petitioner said that he feared the victim, too, because the victim had struck Ms. McLean, "busting" her nose, which the Petitioner said was uncharacteristic of the victim. The Petitioner said that he thought the victim was returning to the apartment to "do me" because Ms. McLean had said the victim accused the Petitioner and Ms. McLean of having sex. The Petitioner thought it was also possible that the victim intended to strike Ms. McLean again when the victim returned.

The Petitioner testified that as the victim placed items over his arms, the victim "started toward" the Petitioner. The Petitioner said that he waited to determine if the victim was going to the apartment door to leave and that the victim "just advanced real quick, come up on me quick." The Petitioner said that he pulled out his handgun, fired it once, fired it again, waited, and fired a third time. He said he stopped firing "[w]hen the threat was down." He said he immediately placed the handgun on the cabinet and called 9-1-1. He said the first shot struck the victim's shoulder area because he had only wanted to wound the victim, not kill him. The Petitioner said, though, that the victim kept coming toward the Petitioner, "sort of leaning forward and into it toward" the Petitioner. He demonstrated the manner in which the victim came toward him. The Petitioner said that

-11-

the victim stumbled after the second gunshot and "caught onto the kitchen sink." The Petitioner said that the victim must have twisted after the second gunshot because the Petitioner would never shoot a person in the back. He said that he fired his handgun from his hip "to keep from killing" the victim. The Petitioner said that after the third gunshot, the victim stepped backward twice, twisted, and fell from right to left. The Petitioner said that the victim lay halfway toward the hallway and the kitchen area with the victim's feet in the kitchen area.

The Petitioner testified that the victim drank "quite a bit" and was intoxicated. The Petitioner recalled that the victim drank beer, that the empty cans were piled next to the garbage can, and that the men had drank together previously.

The Petitioner testified that after the shooting, he walked outside while talking on the telephone to the 9-1-1 dispatcher, that he pointed the paramedics toward the apartment, and that he walked to the police officers when they arrived. The Petitioner said that he had been "very scared" during the incident and thought he was going to lose his life. The Petitioner said that he appeared non-responsive to some of the dispatcher's questions because he was "delirious," which he defined as distraught, because he had shot someone he knew. The Petitioner thought Ms. McLean had been in the living room during the shooting but acknowledged he had been focused on the victim, not Ms. McLean. The Petitioner said that he did not know what Ms. McLean did when he left and that he did not know if Ms. McLean attempted to call 9-1-1.

The Petitioner testified that he did not know he was being recorded as he sat in the police interview room. He said that as he waited for an officer, he called his son to tell his son what had occurred. The Petitioner said that during his interview, he told the detective what happened, that the detectives "were twisting it around," and that he ended the interview. The Petitioner stated that a detective said the victim was in the hallway when the victim was shot, which the Petitioner disputed. The Petitioner said the victim was in the kitchen. The Petitioner said he did not mean to the kill the victim.

On cross-examination, the Petitioner testified that he helped a friend when he agreed to allow Ms. McLean to stay at his apartment, although he consulted his wife before he agreed. The Petitioner said his wife advised him to deny the request. He said that he did not know why the victim hid in a closet after assaulting Ms. McLean, although he acknowledged he had not mentioned the victim's hiding previously. The Petitioner agreed that he told his son on the telephone as the Petitioner sat in the police interview room that the victim "just freaking leaves" the apartment. The Petitioner acknowledged he previously had not stated he comforted Ms. McLean in the bathroom. He said that the victim's arms were by the victim's sides but that the blankets were draped over the victim. The Petitioner did not recall telling the 9-1-1 dispatcher that he told the victim to "back off," that he did not want any trouble, and that he was not "F'ing with your girlfriend."

-12-

The Petitioner did not recall stating the same to the victim. After listening to the recording of the 9-1-1 call, the Petitioner agreed that he made the statements to the dispatcher, although he did not recall saying it and said that the events happened as described in the call.

The Petitioner testified that after the first gunshot, the victim stumbled over the items the victim dropped, that the victim "went down," that the victim "caught" the kitchen counter and twisted, and that the Petitioner fired again, aiming for the victim's hip. The Petitioner said that after the victim had been shot in the hip, the victim began raising his left hand as though the victim had a handgun and that the Petitioner fired a third time. The Petitioner did not know whether the victim was left- or right-hand dominant. The Petitioner acknowledged he stated during his police interview that he thought he shot the victim twice but agreed that he shot the victim three times. The Petitioner said that he had made varying statements because he was distraught.

The Petitioner testified that he did not have a discussion with Ms. Taylor in 2014 about the victim, although he acknowledged that he and Ms. Taylor had talked on occasion. The Petitioner said that in 2013, he moved out of the neighborhood where she lived. He said that when he left the neighborhood in 2013, he and his wife bought a Coachmen recreational vehicle and drove to Florida. The Petitioner said that he had not talked to Ms. Taylor since 2013. He said that he and his wife lived in the Coachmen from 2013 until February 2015, that they returned from Florida in 2014, that they lived in a "camper" for awhile in 2014, and that he moved in the apartment in 2015.

On redirect examination, the Petitioner testified that the events happened in seconds. He clarified that he did not deny making the statements reflected in the recordings of the 9-1-1 call and the police interview but that he did not recall saying all of the statements. He said that his failed attempt to call 9-1-1 was to prevent a confrontation with the victim and that his second 9-1-1 call was to obtain medical assistance for the victim. He explained that he fired his handgun from his hip because extending your arm could lead to a person "[taking] your weapon faster" than if a weapon were at the hip. He said it was more difficult to reach the weapon and kept it from firing. He said that he learned this during his handgun carry permit class. He said that he aimed for the victim's arm, thinking the victim would stop, and that he aimed for the victim's hip, thinking it would "take his leg out from under him."

The Petitioner testified that about one minute spanned the victim's entering the apartment, walking in the bedroom, and coming toward the Petitioner. The Petitioner said the shooting lasted about five or six seconds. He said that he believed he would have been injured if he had not fired the handgun but that he wished it had been him, not the victim. The Petitioner testified that Ms. McLean did not tell him the victim was returning to the apartment to get the victim's wallet.

-13-

Upon this evidence, the jury convicted the Petitioner of second degree murder, a lesser included offense of first degree premeditated murder. The Petitioner agreed to a fifteen-year sentence at 100% service in exchange for his waiving his rights to a sentencing hearing, to file a motion for a new trial, and to appeal his conviction. The Petitioner filed a timely pro se petition for post-conviction relief, and an amended petition was filed by post-conviction counsel. The evidentiary hearing was held on February 28, 2020.

### Post-Conviction Proceedings

At the post-conviction hearing, the Petitioner testified that during his two-year pretrial confinement, trial counsel and co-counsel visited him at the jail three to five times. The Petitioner agreed that he asserted self-defense, that he testified at the trial, and that his attorneys prepared him for his testimony by telling him to "just tell the truth." The Petitioner said that his attorneys did not discuss anything else in connection with his testimony. The Petitioner said that before the trial, his attorneys advised "there were no self-defense laws in the State of Tennessee." He said that before this case, he had never been in "trouble" and that he had not known about legal procedures. He said that he had no influence on the defense proof and recalled that his attorneys told him to tell the truth at the trial when he requested the discovery materials.

The Petitioner testified that before the trial, trial counsel and co-counsel sent him a letter stating that his attorneys were not going to provide him all of the discovery materials. The Petitioner said that he still had not received all of the materials, which included recordings of the interviews. He said "bits and pieces" of the materials were discussed at each meeting with his attorneys. He said he received the discovery materials eventually.

The Petitioner testified that he had wanted trial counsel to present the Petitioner's wife and Detective Maples as defense witnesses. The Petitioner said that since the trial, he had learned Ms. McLean, who was the only witness to the shooting, had provided the police with inconsistent statements regarding the shooting. The Petitioner said that Ms. McLean told Officer Sean Leiser that the Petitioner shot the victim in order to protect her from the victim and that the statement was reflected in a police report. The Petitioner identified Officer Leiser's report, which was received as an exhibit and which reflected that "the female subject began stating that the victim had entered the apartment and that the [Petitioner] shot [the victim] to protect her." The Petitioner said that he received the discovery materials after he was sentenced and transported to prison and that he learned of Officer Leiser's report when he began reviewing the materials. The Petitioner said that he was not provided the report before the trial. He said that his attorneys did not present Ms. McLean's statement at the trial.

-14-

The Petitioner testified that trial counsel likewise did not present evidence of Ms. McLean's additional inconsistent statements. He recalled that at the preliminary hearing, Ms. McLean testified that she did not witness the shooting but testified at the trial that she saw the shooting. He said that counsel also did not question Ms. McLean about her conflicting statements about "the carrying of the clothes" and about "where he put them." The Petitioner said that before the trial, counsel possessed evidence of Ms. McLean's Facebook account in which she stated that only Ms. McLean knew the truth and that "it's going to stay that way." The Petitioner said that he did not learn of the Facebook communication until after the trial. After reviewing a document reflecting the Facebook communication, the Petitioner stated that it showed a "stamp" indicating it had been "processed by evidence or exchanged in discovery." The document was received as an exhibit and reflected as follows:

> [The Petitioner] is the only one that knows what he was doing. If my life was in danger, he wouldn't have waited for me to be out of the way. I see your point but please see mine. I am the only one that knows what really happened. It's going to stay that way too.

The Petitioner testified that trial counsel did not present Detective Maples as a trial witness to establish that the Petitioner feared for his life at the time of the shooting. The Petitioner stated that Detective Maples's testimony would have been relevant to the claim of self-defense. He recalled that Detective Maples was not a prosecution witness and that counsel did not explain why she did not present the detective as a defense witness.

The Petitioner testified that the prosecutors knew Ms. McLean had been untruthful in her trial testimony. The Petitioner recalled that trial counsel questioned Detective Maples at the preliminary hearing about Ms. McLean's inconsistent statements to two additional investigators and that the prosecutor objected on the basis of speculation.

The Petitioner testified that at the trial, the State presented evidence of one telephone call around the time of the shooting but that a second call was not addressed. The Petitioner identified a photograph of the victim's cell phone, which reflected in the call log an incoming call from the Petitioner on July 22, 2015, at 1:24 a.m., and which lasted thirty-one seconds. He agreed this call was discussed at the trial. The Petitioner said he told trial counsel that he tried to call 9-1-1 as soon as the victim arrived on the night of the shooting, attempting to have the victim arrested. The Petitioner said counsel did not present this evidence, although the Petitioner's phone reflected the 9-1-1 call. The Petitioner identified a photograph of his cell phone, which reflected in the call log an outgoing call to 704911 on July 22, 2015, at 1:25 a.m., and which reflect a call duration of zero seconds. The Petitioner said that he unsuccessfully attempted to call 9-1-1 as the victim entered the Petitioner's apartment, that he thought he dialed correctly, and that he held the phone to his ear waiting for the 9-1-1 operator to answer the call. The Petitioner said that his failed

attempt to call 9-1-1 showed he had attempted to avoid a conflict by having the victim arrested for returning to the Petitioner's apartment. The Petitioner said that although he testified at the trial, counsel did not question him about the failed attempt to call 9-1-1.

The Petitioner testified that Jammie Taylor testified at the trial that in 2014, the Petitioner told Ms. Taylor he would shoot the victim if the victim attempted to do anything to him. The Petitioner agreed that Ms. Taylor said the statement occurred in the neighborhood after he walked from his home to Ms. Taylor's home, that he made the statement, and that he referred to the victim as a "MF'er." The Petitioner said that his attorneys did not question him about this statement during his trial testimony. The Petitioner said that if trial counsel had given him the opportunity to discuss the statement during his testimony, he would have stated that he "couldn't have told her that walking from my [home] to her [home], because [he] didn't live in the [neighborhood] in 2014." He said that in 2014, he lived at Music City Apartments in Smyrna and that the neighborhood was located behind the jail in Murfreesboro. He said that although he had owned a home in the neighborhood, he and his wife had sold it in 2011 or 2012. He said that he and his wife bought a thirty-five foot Coachmen and that the Coachmen was parked at Music City Campgrounds in Smyrna between 2012 and 2016. The Petitioner said the Coachman was never parked at the neighborhood in 2014. He said that he attempted to get co-counsel's attention at the trial to request the defense recall the Petitioner's wife to refute Ms. Taylor's testimony but that a bailiff told him to be quiet and threatened to take him "back downstairs." The Petitioner said that his wife was present at the trial and testified during a jury-out hearing but was not asked about the location and sale of the home and about the purchase and location of the Coachmen. The Petitioner said that if his wife had been questioned about these issues, her testimony would have supported his post-conviction testimony.

The Petitioner testified that trial counsel represented him at the trial because she was a family friend. The Petitioner said counsel admitted that she had never tried a murder case and that she enlisted the assistance of co-counsel.

The Petitioner testified that the State's case-in-chief included scientific evidence about ballistics, gun powder residue, stippling, distances and body positions, and the victim's wounds. The Petitioner said, though, the defense did not present any expert witnesses. The Petitioner believed an expert would have established the presence of "residue on the clothes." He said the defense was "able" to examine "certain" clothes.

On cross-examination, the Petitioner testified that trial counsel hired Bob Duhaime as the defense investigator and that he and Mr. Duhaime had two meetings, during which they reviewed information about witnesses and the autopsy report. The Petitioner said that he told counsel what occurred twice and that his version of events did not change.

The Petitioner agreed that although Ms. McLean told the police that the Petitioner shot the victim in order to protect her, she also told the police that the Petitioner and the victim argued about "property" and that the Petitioner became upset and shot the victim. The Petitioner said that this inconsistent statement should have been introduced at the trial because it showed Ms. McLean was not credible. The Petitioner said that he shot the victim in self-defense as the victim came toward him, that he stopped shooting when the victim fell, that he left the apartment, and that he called 9-1-1 to get medical assistance for the victim. The Petitioner agreed that his trial testimony was consistent with this sequence of events. He agreed he misdialed 9-1-1 and said he was "looking at a man coming in my apartment, and the girl telling me that he thinks we had sex."

The Petitioner testified that a defense expert "might have found the bullet holes that was definitely . . . on the left side where he had covered his left shoulder." He said that Ms. McLean told the police that the victim carried "a bag," which the Petitioner believed was a sleeping bag, and that none of the evidence was presented at the trial. The Petitioner said that he did not ask trial counsel about an expert because he did not learn of this evidence until he received the discovery materials in 2017. An August 26, 2017 letter from co-counsel was received as an exhibit and reflected that she enclosed all of the discovery materials, except the audio recording of the 9-1-1 call and the video recordings of the police interviews. The letter stated that either trial counsel, co-counsel, or the defense investigator met with the Petitioner on at least four occasions to review the materials and that they "worked very hard to represent you zealously."

The Petitioner testified that he did not hear the trial court instruct the jury on self-defense, although he heard the court instruct the jury on the lesser included offenses of first degree murder. The Petitioner stated that when he testified at the trial, he was asked by trial counsel to tell the jury everything he knew.

Rhonda Abbott, the Petitioner's wife, testified that in 2012, the Petitioner sold their home and bought a recreational vehicle and that in 2014, the Petitioner lived in the recreational vehicle. She said she was present when the Petitioner sold the home. She said that until recently, she had been unaware of Ms. Taylor's trial testimony that the Petitioner stated in 2014 he was going to shoot the victim. Ms. Abbott said that the Petitioner would have never said this. She said that although she testified at the trial, trial counsel did not ask her questions related to the sale of the home and to the purchase of the recreational vehicle.[1]

---

[1] The record reflects that although Ms. Abbott testified during a jury-out hearing at the trial regarding the victim's character and reputation for violence, she was not a trial witness. However, on cross-examination at the jury-out hearing, she testified that the home was sold in 2012 or 2013.

On cross-examination, Ms. Abbott testified that she and Ms. Taylor had a "light friendship" but that she did not know Ms. Taylor well. Ms. Abbott said that it was not possible for the Petitioner to have been at the neighborhood in 2014. She said that Ms. Taylor and the Petitioner were friends but were not close. Ms. Abbott said that "they," referring in part to Ms. Taylor, were better friends with the victim and his girlfriend than with Ms. Abbott and the Petitioner.

Trial counsel testified that she began practicing law in 2011 and that she had tried five jury trials at the time of the Petitioner's case. Counsel said the present case was her first murder trial. She said that she and the Petitioner had been good friends before the Petitioner's arrest. Counsel said that she visited the Petitioner at the jail as soon as she learned of the charges and that she visited the Petitioner approximately once per month during the course of two years. Counsel estimated that she visited the Petitioner eighteen to twenty times but did not have records related to her jail visits. Counsel said that preparing a client to testify was a large undertaking when the client was charged with first degree murder.

Trial counsel testified that self-defense was the chosen theory. She acknowledged that she should have objected when the State referred to the shooting as a murder.

Trial counsel testified that Ms. McLean provided critical testimony because she was the only witness to the shooting. Counsel said that she possessed Ms. McLean's pretrial statement, in which Ms. McLean said that the Petitioner shot the victim to protect Ms. McLean. Counsel recalled that the statement attributed to Ms. McLean was contained in a police report completed by a police officer. Counsel agreed that evidence of this statement was not presented at the trial. Counsel disagreed that questioning Ms. McLean about the statement would have benefited the defense. Counsel said that the defense strategy was to not "open too many doors" and that she limited cross-examination to Ms. McLean's preliminary hearing testimony. Counsel knew that Ms. McLean had made statements detrimental to the defense and said that counsel did not want the State to introduce these additional statements to bolster its case. Counsel agreed that the additional statements were contradictory to each other and to her preliminary hearing testimony and that the contradictory statements could have been used to impeach Ms. McLean's credibility. Counsel said that impeaching Ms. McLean's testimony was an important component of counsel's trial strategy.

Trial counsel testified that when she and co-counsel interviewed Ms. McLean at the jail, Ms. McLean stated that she was the only person who knew what happened and that it would stay that way. Counsel was unsure whether Ms. McLean made the same statement in a text message. Counsel said that "there was no way . . . to introduce that statement without making myself a witness." Counsel said that she and co-counsel "had to balance not making ourselves a witness" and that they decided they could not introduce the

-18-

statement. She said that not making herself a witness was her only consideration in not introducing the statement.

Trial counsel did not recall Ms. Taylor's testimony about the Petitioner's threat to shoot the victim being heavily litigated at the trial. She said she vaguely recalled a jury-out hearing on the issue but did not recall if the Petitioner lived in the neighborhood at the time the statement was alleged to have been made. Counsel recalled that she and the Petitioner discussed Ms. Taylor. Counsel disagreed that the Petitioner was not given the opportunity to address the alleged 2014 statement at the trial. Counsel said that the Petitioner did not attempt "to get her attention with regards to Ms. Taylor." Counsel said that co-counsel conducted the Petitioner's direct examination and that counsel did not recall if the Petitioner was questioned about the statement. Counsel agreed, though, that the Petitioner should have been questioned about the statement because the Petitioner did not live in the neighborhood in 2014 and because the Petitioner had sold his home two years before the statement was alleged to have occurred. Counsel did not know if Ms. Abbott was questioned about the sale of the home and about where the Petitioner lived in 2014. Counsel agreed that challenging Ms. Taylor's credibility would have been helpful to the defense.

Trial counsel thought evidence of the Petitioner's attempt to call 9-1-1 was introduced at the trial but stated that she would not dispute the transcript. Counsel said that the evidence should have been introduced because the evidence was an important component of the Petitioner's trial testimony and of the defense theory of self-defense.

Trial counsel did not recall a ballistics expert testifying at the trial and stated that the defense did not dispute the Petitioner's shooting the victim. Counsel said that the focus was self-defense. She recalled, though, that the medical examiner testified about stippling. She agreed the jury heard evidence about residue on clothes, distance and body positions, and the design of the crime scene. She stated that a defense expert was unnecessary in this case because the focus was self-defense and because she and co-counsel concluded that the medical examiner's testimony was favorable to the defense. Counsel said that the defense never intended to challenge how the victim was shot as a matter of trial strategy. Counsel said that the medical examiner explained multiple ways the victim could have been shot and that one of the ways was "very favorable" to the theory of self-defense. She said that, as a result, she determined that a medical expert was unnecessary.

On cross-examination, trial counsel testified that she, co-counsel, and the Petitioner discussed self-defense extensively. She said that they likewise discussed the elements of first and second degree murder, knowingly firing a gun, and the "castle doctrine" in comparison to Tennessee's self-defense statute. Counsel agreed that the indictment contained the word murder and that the indictment was read to the jury.

-19-

Trial counsel reviewed Ms. McLean's Facebook message previously received as an exhibit. Counsel testified that she did not want the evidence presented to the jury because the statements implied that the Petitioner was waiting to shoot the victim.

Trial counsel testified that she worked on the Petitioner's case twenty to thirty hours per week and that she and co-counsel consulted more experienced criminal attorneys in preparing for the trial. Counsel recalled that she and co-counsel went to the scene and took hundreds of photographs, that they went to the Petitioner's former neighborhood, that they spoke to five or six residents, that they examined the victim's clothes at the police station, and that they utilized a mock jury. She stated that the mock jurors thought Ms. McLean was credible and did not like the Petitioner's appearance.

Trial counsel testified that co-counsel questioned Detective Abbott about the 9-1-1 call at the trial. Counsel agreed the Petitioner's attempted 9-1-1 call was before the jury. Counsel said that she did not have any reason to believe Ms. Taylor lied. Counsel said that she was unaware of any bias Ms. Taylor could have had against the Petitioner and that Ms. Taylor might have been mistaken about the date on which the Petitioner mentioned shooting the victim.

Trial counsel testified that relative to the trial evidence, the Petitioner was bothered by the blankets. She said that the Petitioner wanted the defense to examine the blankets for a bullet hole but that the blankets were not a trial exhibit and were not placed in the police evidence locker. She said that, as a result, she could not examine them.

Co-counsel testified that she began practicing law in 2013 and that she had tried eight jury trials before the Petitioner's case. She said the Petitioner's case was her first homicide. She stated that she and trial counsel "engaged in consultation" about eighteen to twenty times before the trial. Co-counsel agreed that trial counsel met with the Petitioner more frequently but that they met with the Petitioner together at least five times at the jail. Co-counsel said that the defense investigator met with the Petitioner "quite a few times," as well. She recalled that the investigator reviewed the discovery materials with the Petitioner. She said she and trial counsel met with the Petitioner at each court appearance. She reviewed the letter previously received as an exhibit and stated it inaccurately reflected that she, trial counsel, and the investigator met with the Petitioner on at least four occasions to review discovery. She said that there were additional meetings at the jail, that she went to the jail four times per week before the trial, and that trial counsel might have gone to the jail daily. Co-counsel said that she maintained notes from her meetings with the Petitioner. She clarified that she met with the Petitioner four times to review discovery and that she met with the Petitioner at least five additional times before the trial.

-20-

Co-counsel did not recall Ms. McLean's inconsistent statements and that she did not know whether any inconsistent statements were admitted at the trial. Co-counsel did not recall if any of the State's witnesses' inconsistent statements were presented at the trial.

Co-counsel did not recall whether the Petitioner was questioned on direct examination about Ms. Taylor's testimony that the Petitioner threatened to shoot the victim in 2014. Co-counsel said that this was a "very dangerous topic" because the victim had "gotten into it" with the Petitioner and additional neighbors on more than one occasion. She said that several people did not seem to remember all of the events and that the defense did not want to remind anyone. She said that Ms. Taylor's testimony on this point was limited in scope and that co-counsel was sure the State was not aware of the additional instances. Co-counsel said that whether the Petitioner lived in the neighborhood was unimportant because the jury heard evidence that the Petitioner and the victim were friends, worked together, and commuted to work together. She said that regardless of whether the Petitioner lived in the neighborhood, the men were together frequently.

Co-counsel testified that she did not seek any expert testimony. She was unsure whom she would have consulted who would have been more favorable than the medical examiner. She recalled that an issue with "the car" arose on the day of the trial and said that the trial judge asked if the defense wanted to move for a continuance, that she and the Petitioner discussed it, and that the Petitioner did not want to reschedule the trial.

On cross-examination, co-counsel testified that her clients did not need to have discovery materials at the jail because the materials could be found by inmates, who might contact the State with information about her client's case. She said her practice was to review discovery materials without providing them to the client. She said that she and the Petitioner reviewed the materials and that the Petitioner appeared to understand the evidence against him. She denied telling the Petitioner that self-defense was not available in Tennessee. Co-counsel stated that she questioned Detective Abbott about the Petitioner's attempted 9-1-1 call.

On March 25, 2020, the post-conviction court entered a written order denying relief. The court determined that the Petitioner was prepared adequately for the trial and sentencing hearing. The court credited counsel's testimony that they met with the Petitioner on multiple occasions before the trial. The court determined that the "alleged inaccuracy" in Ms. Taylor's testimony about the Petitioner's threat to shoot the victim was not critical to the trial. The court found that the testimony related to the Petitioner's alleged statement was "well removed in time from the events" in this case and that the Petitioner had the opportunity to challenge her testimony during his trial testimony. The court determined that the Petitioner failed to prove by clear and convincing evidence that counsel's failure to present his "estranged wife" to rebut Ms. Taylor's testimony would have resulted in a different outcome at the trial.

The post-conviction court determined that counsel did not provide ineffective assistance "in any way." The court found that the evidence against the Petitioner was considerable and included a witness to the shooting, contradictory statements by the Petitioner, and extensive physical evidence. The court found that the trial court instructed the jury on self-defense. The court determined that counsel met with the Petitioner numerous times and hired an investigator, who met with the Petitioner numerous times. The court found that the Petitioner had the opportunity to confer with his counsel throughout the trial, as well.

Although the post-conviction court entered a written order, the court stated at the evidentiary hearing that counsel's trial strategy was reasonable and was "probably the best strategy available based upon the evidence." The court, likewise, discredited the Petitioner's testimony regarding counsel's efforts before, during, and after the trial. This appeal followed.

**Analysis**

The Petitioner contends that the post-conviction court erred by denying relief on his ineffective assistance of counsel claims. The State responds that the Petitioner failed to establish his claims by clear and convincing evidence. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2018). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2018). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

-22-

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

## A.    Lisa McLean

The Petitioner asserts that trial counsel failed to impeach Ms. McLean with the written message in which she said she was "the only person who knows the truth, and it's going to stay that way." He asserts that the statement indicated Ms. McLean lacked credibility about the shooting. He, likewise, argues, that counsel failed to impeach her with her contradictory statements from the preliminary hearing and from a police statement in which Ms. McLean stated the Petitioner shot the victim in order to protect her.

## 1.    Facebook Message

The record reflects that before the trial, Ms. McLean sent a message to an unidentified person stating,

> [The Petitioner] is the only one that knows what he was doing. If my life was in danger, he wouldn't have waited for me to be out of the way. I see your point but please see mine. I am the only one that knows what really happened. It's going to stay that way too.

The message was not addressed during Ms. McLean's trial testimony. However, the record reflects that trial counsel made a strategic decision not to cross-examine Ms. McLean about the message because although the message could have been used to impeach

Ms. McLean's credibility about the shooting, the message also showed that the Petitioner waited to shoot the victim, which was inconsistent with the Petitioner's testimony and with his theory of self-defense. The record supports the post-conviction court's determinations that trial counsel did not provide deficient performance and that the Petitioner failed to establish prejudice. The Petitioner is not entitled to relief on this basis.

**2.      Preliminary Hearing**

In his appellate brief, the Petitioner does not cite to any specific instance in which Ms. McLean's trial testimony was inconsistent with her preliminary hearing testimony. Although the preliminary hearing and trial transcripts are included in the appellate record, he, likewise, does not cite to the record to support his argument that trial counsel failed to impeach Ms. McLean with her inconsistent preliminary hearing testimony. Tennessee Rule of Appellate Procedure 27(a)(7)(A) requires that an appellant's argument contain "citations to the authorities and appropriate references to the record . . . relied on." The rules of this court provide, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived[.]" Tenn. Ct. Crim. App. R. 10(b). Notwithstanding the deficiency in the Petitioner's brief, we will consider the issue. We caution post-conviction counsel, however, that appellate review is frustrated by the failure to identify the basis in the record for the argument presented and that compliance with the Rules of Appellate Procedure is expected.

Trial counsel limited her cross-examination of Ms. McLean to inconsistent statements from the preliminary hearing as a matter of trial strategy. Counsel stated that she did not want to "open too many doors" because counsel knew Ms. McLean had made statements detrimental to the defense and did not want the State to bolster its case.

Although the Petitioner thought that Ms. McLean had provided inconsistent testimony relative to whether she saw the shooting, the record reflects otherwise. The transcripts reflect that at the preliminary hearing and the trial, Ms. McLean testified that she had her back turned to the Petitioner and that she turned around to look at the men after the victim had been shot. Therefore, the testimony was not inconsistent. We note that trial counsel and co-counsel were not questioned about the statements at the post-conviction hearing.

Additionally, the Petitioner testified that trial counsel failed to question Ms. McLean about her conflicting statements in connection with "the carrying of the clothes" and about "where he put them." Again, trial counsel and co-counsel were not questioned about the statements at the post-conviction hearing. However, we glean from the record that the Petitioner referred to Ms. McLean's preliminary hearing testimony in which she stated that after the victim left the bedroom carrying the blankets, the victim placed the blankets "on the floor behind the love seat in the living room." Ms. McLean did not provide this

testimony at the trial. However, this testimony, while inconsistent with Ms. McLean's trial testimony, would not have supported the Petitioner's claim of self-defense, explicitly conflicting with the Petitioner's trial testimony, and would have been detrimental to the defense. The record supports a finding that trial counsel made a strategic decision, and as a result, the record supports the post-conviction court's determinations that trial counsel did not provide deficient performance and that the Petitioner failed to establish prejudice.

In any event, the trial transcript reflects that trial counsel impeached Ms. McLean with four inconsistent statements from her preliminary hearing testimony. First, Ms. McLean testified at the trial that she did not hide the victim's wallet under the couch cushion on the night of the shooting, but she conceded after reviewing her preliminary hearing testimony that she kept the wallet because she did not want the victim to drive due to his intoxication. Second, Ms. McLean testified at the trial that the Petitioner did not assist her with cleaning the blood from her face after the victim assault her. However, after reviewing her preliminary hearing testimony, she agreed she had previously testified that the Petitioner had assisted her. Third, Ms. McLean testified at the trial that she never gave the victim his wallet because the victim refused to take it, but she admitted after reviewing her preliminary hearing testimony she had previously testified that she returned the wallet to the victim before he left the apartment. Last, Ms. McLean admitted at the trial that she had marked the victim's location at the time of the shooting on a diagram closer to the kitchen at the preliminary hearing than she did at the trial. As a result, the record supports the post-conviction court's determinations that trial counsel did not provide deficient performance and that the Petitioner failed to establish prejudice. The Petitioner is not entitled to relief on this basis.

### 3.    Police Statements

The Petitioner asserts that trial counsel failed to impeach Ms. McLean with her police statement. At the post-conviction hearing, a police report completed by Officer Sean Leiser was received as an exhibit and reflected that Ms. McLean stated "that the victim had entered the apartment and that the [Petitioner] shot [the victim] to protect her." Although the Petitioner alleged that trial counsel failed to impeach Ms. McLean's credibility with this police statement, the record reflects that the evidence was presented to the jury. On direct examination, the prosecutor asked Ms. McLean if she had previously stated that the Petitioner shot the victim in an effort to defend her, and Ms. McLean clarified that she had previously stated the Petitioner "would protect her" but that she did not believe the Petitioner shot the victim to protect her. As a result, Ms. McLean's inconsistent police statement was before the jury.

The remaining police statement discussed at the post-conviction hearing was Ms. McLean's statement that the Petitioner and the victim argued about property and that the Petitioner became upset and shot the victim. Although the Petitioner believed this

statement was further evidence of Ms. McLean's lack of credibility, trial counsel testified that she limited her cross-examination of Ms. McLean to inconsistent statements from the preliminary hearing as a matter of trial strategy. Counsel stated that she did not want to "open too many doors" because counsel knew Ms. McLean had made statements detrimental to the defense and did not want the State to bolster its case. Ms. McLean's statement that the Petitioner shot the victim in connection with an argument about property would have been detrimental to the theory of self-defense and would have contradicted the Petitioner's trial testimony. The record supports a finding that counsel made a strategic decision not to question Ms. McLean about the statement. As a result, the record supports the post-conviction court's determinations that trial counsel did not provide deficient performance and that the Petitioner failed to establish prejudice. The Petitioner is not entitled to relief on this basis.

## B.    Self-Defense Testimony

The Petitioner argues that trial counsel should have presented Detective Maples as a defense witness to elicit testimony that the Petitioner stated during his police interview that he shot the victim because he feared for his life. The State responds that the Petitioner's fear of the victim on the night of the shooting was presented to the jury.

The record reflects that Detective Maples did not testify at the Petitioner's trial. In any event, the Petitioner failed to present Detective Maples as a witness at the post-conviction hearing, and this court will not speculate about the substance of his testimony. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

However, Detective Abbott, who investigated the shooting alongside Detective Maples and who was present during the police interview, testified at the trial that the Petitioner reported being afraid of the victim and that the Petitioner said the victim came toward the Petitioner. Likewise, the Petitioner testified at the trial that he feared for his life and that the victim came "right toward" the Petitioner and attempted "to get" the Petitioner. The Petitioner stated that he feared the victim because he could not see the victim's hands, because he did not know if the victim had a weapon, because he "had a feeling" the victim was going to hurt him, and because the victim had already assaulted Ms. McLean. The Petitioner, likewise, expressed his fear of the victim because according to the messages exchanged by Ms. McLean and the victim, the victim had accused the Petitioner of having an affair with Ms. McLean. The Petitioner stated he was scared during the incident and thought he was going to lose his life. As a result, evidence that the Petitioner feared for his life was presented to the jury for its consideration. The record supports the post-conviction court's determinations that trial counsel did not provide deficient performance and that the Petitioner failed to establish prejudice. The Petitioner is not entitled to relief on this basis.

## C.    State's Reference to Murder

The Petitioner argues that his defense was prejudiced by trial counsel's failure to object when the prosecutor referred to the shooting as murder because the Petitioner had admitted shooting the victim and asserted self-defense.  The State responds that the Petitioner has failed to show any prejudice.

During the post-conviction hearing, trial counsel was directed to a portion of the trial transcript, in which the prosecutor asked the victim's aunt if she had spoken with the victim about the victim's "plans in the lead up to the murder."  The record does not reflect that defense counsel objected, moved to strike, or requested a curative instruction to the prosecutor's singular characterization of the shooting as a murder.  This was the only instance of the prosecutor's improper characterization addressed at the post-conviction hearing.  Trial counsel testified that the indictment had been read to the jurors before the presentation of the proof and that the indictment alleged the Petitioner had committed first degree murder.  However, the jurors were told at the beginning of the trial that the Petitioner had never denied shooting the victim and that the Petitioner had asserted self-defense.  The jurors were likewise charged with determining whether the Petitioner had committed first degree murder, and the trial court instructed the jury on the lesser included offenses of second degree murder, voluntary manslaughter, reckless homicide, and criminally negligent homicide.  The trial court likewise instructed the jury on self-defense.  As a result, the record supports the post-conviction court's determination that the Petitioner failed to establish any deficiency in counsel's performance resulted in prejudice.  The Petitioner is not entitled to relief on this basis.

## D.    Attempted 9-1-1 Call

The Petitioner argues that trial counsel failed to introduce evidence of the Petitioner's unsuccessful attempt to call 9-1-1 before the shooting.  He argues that if counsel had asked him about the attempted call during direct examination, he would have testified that he wanted to have the victim removed from the apartment before the shooting occurred.  He asserts that this evidence supported his claim of self-defense.  The State responds that the evidence was presented to the jury.

The record reflects that Detective Abbott testified that the Petitioner stated during his police interview he attempted to call 9-1-1 before the shooting but had misdialed.  Detective Abbott likewise stated that the call log on the Petitioner's cell phone showed the Petitioner had misdialed, and a photograph of the call log was received as an exhibit and showed the attempted call was placed to 9-4-1 at 1:26 a.m.  Furthermore, on redirect examination, the Petitioner testified that his failed attempt to call 9-1-1 before the shooting was initially to prevent a confrontation with the victim and that his completed 9-1-1 call after the shooting was to obtain medical assistance for the victim.  As a result, the jury

heard evidence that the Petitioner attempted to call 9-1-1 in an effort to prevent an altercation. The record supports the post-conviction court's determinations that trial counsel did not provide deficient performance and that the Petitioner failed to establish prejudice. The Petitioner is not entitled to relief on this basis.

## E.    Rhonda Abbott

The Petitioner argues that trial counsel failed to present Ms. Abbott as a defense witness in an effort to impeach Ms. Taylor's credibility about the Petitioner's 2014 statement that he would shoot the victim. The State does not address this allegation.

The record reflects that at the trial, Ms. Taylor testified that she, the victim, and the Petitioner were neighbors. She said, initially, that in 2014, the Petitioner came to her home and that they discussed an argument between the victim and the Petitioner. She said that during the discussion, the Petitioner said, "[O]ne of these days he's going to come at me, he's going to say the wrong f------ thing or he's going to do the wrong f------ thing, and I'm going to shoot that motherf-----." Ms. Taylor later testified that the conversation occurred in 2013. Although she was uncertain about the year, she stated that the conversation occurred "right before" the Petitioner and the victim moved out of the neighborhood. As a result, Ms. Taylor's testimony showed the Petitioner made the statement when the Petitioner lived in the neighborhood. We note that Ms. Taylor testified, too, that the Petitioner's statement was not a threat but, rather, was a response to the next time the victim threatened the Petitioner.

Because Ms. Taylor's testimony showed that the Petitioner's statement occurred when the Petitioner lived in the neighborhood, Ms. Abbott's proposed testimony that the Petitioner sold their home and moved in 2012 or 2013 would not have impeached Ms. Taylor's testimony. In any event, the Petitioner testified at the trial that he did not have a conversation with Ms. Taylor about the victim in 2014 because he sold his home and left the neighborhood in 2013. He likewise testified that in 2013, he and Ms. Abbott bought a Coachmen and drove to Florida and that he had not spoken to Ms. Taylor since 2013. Therefore, the record supports the post-conviction court's determinations that trial counsel did not provide deficient performance by failing to present Ms. Abbott as a witness and that the Petitioner failed to establish prejudice. The Petitioner is not entitled to relief on this basis.

## F.    Defense Experts

The Petitioner argues that trial counsel failed to investigate, explore, and introduce mitigating expert testimony in response to the State's expert witnesses. The State responds that trial counsel made strategic decisions not to engage any experts because the Petitioner did not dispute shooting the victim and because the medical examiner provided evidence

favorable to the defense. Likewise, the State argues that the Petitioner failed to present any expert witness at the post-conviction hearing and cannot, therefore, establish prejudice.

At the post-conviction hearing, trial counsel testified that the Petitioner did not dispute shooting and causing the victim's death and that, as a result, the defense focused on self-defense, which counsel concluded rendered defense experts unnecessary. Counsel said that the defense never intended to challenge how the victim was shot as a matter of trial strategy. Counsel said that she and co-counsel discussed potential experts but concluded that the medical examiner's testimony would be favorable to the defense.

The record reflects that at the trial, the medical examiner provided testimony consistent with the theory that the fired bullets could have traveled through the blankets and clothes carried by the victim at the time of the shooting and that it was possible soot and stippling could have been on those items. The medical examiner noted that the victim's clothes and the items he carried at the time of the shooting were not submitted for his review and analysis, and other evidence showed the items were not recovered by the police. As a result, the defense did not have any physical evidence for an expert to examine for bullet holes, gunshot residue, soot, and stippling. The medical examiner testified that if the two chest wounds were inflicted first, as described by the Petitioner, the victim would have to "twist up and turn away," potentially explaining how the victim was shot in the back.

We note that trial counsel requested that the trial court instruct the jury that the State had a duty to preserve the blankets and items carried by the victim based upon testimony from Detective Abbott, Dr. Deering, Ms. McLean, and the Petitioner. The defense argued that even in the absence of bullet holes, the evidence showed that it was likely that the blankets could have shown the presence of gunshot residue, which would have been exculpatory or favorable to the Petitioner based on his claim of self-defense. The court, however, denied the request after finding that the State was not negligent by failing to collect the blankets and that the State did not have an obligation to preserve the evidence. The record supports the post-conviction court's determinations that trial counsel did not provide deficient performance and that the Petitioner failed to establish prejudice. The Petitioner is not entitled to relief on this basis.

## G.  Cumulative Error

The Petitioner argues that he is entitled to relief based upon the cumulative effect of trial counsel's multiple instances of deficient performance. The concept of cumulative error is that multiple errors, though harmless, cumulatively violate the right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). However, the record does not reflect multiple instances of deficient performance by the Petitioner's attorneys, and as a result,

no cumulative error claim is possible.  The Petitioner is not entitled to relief on the basis of cumulative error.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE